UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
LEONARD RILEY,

               Plaintiff,         06 Civ. 7762 (JSR)(DFE)

     -against-         REPORT AND RECOMMENDATION
                                 TO JUDGE RAKOFF
MICHAEL J. ASTRUE,
Commissioner of Social Security,

               Defendant.
----------------------------------X

DOUGLAS F. EATON, United States Magistrate Judge.

    Represented by Douglas C. J. Brigandi, Esq., plaintiff
Leonard Riley seeks judicial review of a final decision of the
Commissioner of Social Security that denied his application for
Disability Insurance Benefits ("DIB") and Supplementary Security
Income ("SSI") disability benefits.  Mr. Riley alleges that he
has been unable to work since he injured his head, neck and back
in an elevator accident in June 1995.  (Tr. 73, 25-26.)

    On September 7, 2007, plaintiff moved for judgment on the
pleadings.  On November 13, 2007, the Commissioner moved for an
order affirming the Commissioner's decision and dismissing the
Complaint.  Neither party filed any second set of papers
concerning these motions.

    As to the DIB claim, our Court must determine whether
substantial evidence supports the Commissioner's decision that
Mr. Riley was not disabled from June 11, 1995 (his alleged onset
of disability) through December 31, 2000 (when his insured status
expired).  As to the SSI claim, the issue is whether substantial
evidence supports the Commissioner's decision that Mr. Riley was
not disabled from June 17, 1998 (the date of his first
application) through November 19, 2004 (the date of the decision
by the Administrative Law Judge).  For the sake of clarity, both
the Commissioner's motion and my Report address whether Mr. Riley
was disabled for any 12-month period during the entire time from
June 1995 through November 2004.

    For the reasons I shall discuss, I recommend that Judge
Rakoff affirm the Commissioner's decision and dismiss the
Complaint.

Mr. Riley was born on January 2, 1967. He attended special education classes and completed the eleventh grade. (Tr. 79, 699.) He is able to speak, read and write in English. The Administrative Law Judge ("ALJ") observed that Mr. Riley speaks "with a distinct stammer, but he was easily understandable." (Tr. 16.) From 1989 to June 1995, he worked as a "telephone escort" for a security company, and also worked as a security guard. Those jobs involved mostly walking and standing; he was not required to lift or carry objects weighing more than 10 pounds, and he was not required to restrain people. (Tr. 74, 712-13.)

On June 11, 1995, Mr. Riley (then 28 years old) was working as a security guard. He was injured on the job in an elevator that suddenly accelerated upwards and crashed into the ceiling of the elevator shaft. He was thrown into the air and landed on his head, neck and back. The elevator then quickly descended. Emergency personnel rescued him and transported him by ambulance to New York Presbyterian Hospital. (Tr. 26.)

I. Procedural Background

In September 1995, Mr. Riley filed a workers' compensation action, which he ultimately settled on January 21, 1999. (Tr. 130-39.) Pursuant to the settlement, the Workers' Compensation Board classified him as "permanently partially disabled." (Tr. 136.) The judge in his case warned him that, if he ever returns to work for any company, he must notify his attorney "and also the insurance company, because if the insurance [company] catches you working while getting a classification, you will be in a lot of trouble ...." (Tr. 137.) It may be that this created some incentive for Mr. Riley not to attempt to find any work, because he might lose his workers' compensation payments.

Mr. Riley also filed three applications for Social Security disability benefits. The first application, filed June 17, 1998, was for SSI; it was denied initially on August 1, 1998. (Tr. 39.) His second application, filed June 7, 2000, was for DIB and SSI; it was denied on October 4, 2000. (Tr. 40, 63-64.) The third application, filed May 13, 2002, was for DIB and SSI; it was denied on July 2, 2002. (Tr. 38, 42-46, 65-67.) On December 9, 2002, he filed a request for a hearing before an ALJ. (Tr. 47-48.)

On November 2, 2004, attorney Evandro C. Gigante of Proskauer Rose LLP submitted a pre-hearing memorandum (Tr. 25-30)

to ALJ Kenneth G. Levin.  Mr. Gigante also appeared with Mr. Riley at the hearing before ALJ Levin on November 3, 2004.  Also attending the hearing were (a) non-examining neurologist Dr. Warren Cohen and (b) vocational expert Edna Clark.  (Tr. 14, 691-757.)

Mr. Riley testified at Tr. 697-744.  He said that he could not work because his head, neck, and back hurt, and because he got headaches every few days that would last for about an hour or two.  (Tr. 716-18.)  However, he admitted that his headaches and back pain were usually relieved by Aleve and/or Bextra, and that his neck pain was usually relieved by Icy-Hot.  (Tr. 720-25.)

He testified that he spent most of his days lying on the couch watching television.  (Tr. 727, 735.)  He lived with his godmother, who did all of the shopping, cooking and cleaning for him. (Tr. 728, 735.)  He said the heaviest thing that he could lift was the remote control for his television.  (Tr. 734-35.)  He also said that he could not walk more than one block and could not travel by train or by bus; instead, if he has to go somewhere, he takes a taxicab.  Indeed, he claimed that the last time he took a subway or bus was in 1994 and 1995, before the accident.  (Tr. 731-32, 734.)

Dr. Warren Cohen testified at Tr. 744-51.  He did not examine plaintiff but he reviewed the medical records.  He diagnosed degenerative osteoarthrosis of the cervical spine, and lumbosacral [1] sprain/strain.  (Tr. 744.)  Dr. Cohen said that x-rays and an MRI of plaintiff's lumbar spine were normal, as was an MRI of plaintiff's brain, and that x-rays of the cervical spine showed minimal degenerative changes.  (Tr. 745-46.)  He noted that plaintiff had been treated with physical therapy, anti-inflammatory agents and analgesics, but the symptoms persisted despite these treatments.

A March 24, 1997 electrodiagnostic study, conducted by plaintiff's treating physician Dr. Leonard Langman, showed some evidence of a cervical radiculopathy [2] at the C-4 to C-5 level, but Dr. Cohen testified:

---

[1]    **Lumbosacral** pertains to the loins and sacrum. Dorland's Illustrated Medical Dictionary, ("Dorland's") p. 956 (27th ed. 1988).

[2]    **Radiculopathy** is a disease of the nerve roots. Dorland's, p. 1405 (27th ed. 1988).

... [I]t just really shows minimal findings of a
radiculopathy in that it showed some changes in the
paraspinal muscles. That is the muscles right around
the spine. Interestingly these -- this finding alone
would usually be seen early on in the course of a
radiculopathy and it is a mild, somewhat equivocal
finding, especially in the absence of other findings
that would support it and especially in the face of
there being a longstanding history of this being a
chronic disorder. ... [T]he single finding that was
found here would most typically be found early on in
the course of an injury, meaning the first several
weeks.

(Tr. 744-46.) When asked if there had been any positive
neurological findings on tests, Dr. Cohen replied:

No, there have not. The -- his neurologic exam
has been normal through the exams that are documented
in the record, and in general, the musculoskeletal
aspect of the exam has shown little else, other than
some paraspinal spasm and tenderness.

(Tr. 747.) Dr. Cohen also said that he would not expect a
lumbosacral sprain or strain to be symptomatic nine years after
it occurred:

It's difficult to put together the findings on the
x-rays and the exams with the degree of symptomatology
that the Claimant has. For example, the claimant
described a very significant limitation of neck
movement, and that's not consistent with the exams in
the medical record, and it would not be consistent with
a mild degree of degenerative change in the spine.

(Tr. 747.)

Dr. Cohen testified that Dr. Langman's records provided
virtually no information and were not kept in accordance with
standard medical practice for record keeping, as they merely
stated, in repetitive fashion, that plaintiff "showed up at the
visit and that the symptoms were unchanged." (Tr. 747-48.)
Moreover, the records did not describe any medical decision
making, nor did they supply any reason why Dr. Langman would
continue to see Mr. Riley every two weeks for more than seven
years when there had been no change in either his findings or
treatment plan. (*Id.*) Dr. Cohen testified that Dr. Langman's
January 31, 2003 Residual Functional Capacity ("RFC") assessment

-4-

(see Tr. 661-66) was not consistent with the medical evidence, including Dr. Langman's own records. (Tr. 748.) Instead, Dr. Cohen believed that plaintiff's RFC was as follows: (1) he could lift and carry ten pounds frequently and twenty pounds occasionally; (2) he could stand and walk for approximately six hours; (3) he could sit for six hours, with the need to intermittently change positions by taking a break for a few minutes every 30 to 45 minutes; (4) he could not climb ropes, ladders, or scaffolds; (5) he could frequently stoop; (6) he could occasionally kneel, crouch, and crawl; and (7) he had no manipulative limitations. (Tr. 748-49.)

Vocational expert Edna Clark testified at Tr. 751-56. She said that plaintiff's prior work as a security guard was classified as a job that was semiskilled, with a light exertional level. (Tr. 751-52.) The ALJ asked her to consider the following hypothetical to determine whether a person could work as a security guard: an individual of plaintiff's age, education and prior work experience who (a) has the ability to stand and/or walk for a total of 6 hours in an 8-hour workday, (b) can sit for a total of 6 hours in an 8-hour workday, with breaks to change position every 45 minutes, and (c) has a moderate stammer. Ms. Clark said that such an individual could perform plaintiff's past work. (Tr. 752-53.) The ALJ then asked her to assume that the hypothetical individual could perform only simple, routine, low-stress jobs involving low levels of concentration and interpersonal interaction. She testified that such an individual could not do plaintiff's past relevant work, but that he could perform jobs such as a final assembler, or a cafeteria attendant, or a machine tender, which were all light, unskilled jobs that existed in significant numbers. (Tr. 753-54.) Moreover, at the unskilled sedentary level, she stated that the individual could work as a bench assembly worker, or a button reclaimer, or a buckle/wire inserter. (Tr. 755.)

On November 19, 2004, ALJ Levin issued an 11-page opinion denying DIB and SSI disability benefits. (Tr. 14-24.) The ALJ ruled that Mr. Riley was able to perform his past work as a security guard. The ALJ also ruled that "in the event a reviewing body were to conclude -- as I do not -- that the claimant in fact has a 'severe' mental impairment," then Mr. Riley could still perform a large number of available light jobs, such as (1) final assembler, (2) cafeteria attendant, (3) machine tender, (4) bench assembly worker, (5) button reclaimer, and (6) buckle wire assembler. (Tr. 23-24.)

After receiving the unfavorable decision, plaintiff changed lawyers and retained Mr. Brigandi. In January 2005, Mr. Brigandi

asked the Appeals Council to reopen plaintiff's prior applications. (Tr. 680-81; repeated at 689-90.) However, both of those prior applications had already been reopened by the ALJ at the start of the November 2004 hearing. (Tr. 696-97.) On July 21, 2005, Mr. Brigandi appealed the ALJ's November 19, 2004 decision to the Appeals Council. (Tr. 685-88.) On July 27, 2006, the Appeals Council denied his requests for review; hence the ALJ's decision became the final decision of the Commissioner. (Tr. 7.)

On September 27, 2006, Mr. Brigandi filed a Complaint in our Court. The Commissioner responded with an answer and a two-volume transcript of the record. The case was assigned to Judge Rakoff, who referred the case to me to write a Report and Recommendation. In September and November 2007, the parties each moved for judgment on the pleadings. Neither party filed any second set of papers concerning these motions.

II. Plaintiff's Medical History

Plaintiff was examined and treated by several medical providers. Immediately after the June 1995 accident, he was treated at the Emergency Room at New York Presbyterian Hospital/Weill Cornell Medical Center. (Tr. 553-58, 718-19.) From June 1995 to December 1996, he was treated at Greater Metropolitan Medical Services, and its successor corporation, Medical Specialist Consultants. [3] (Tr. 110-18, 140-91, 559-66, 694-95.) From January 1997 to October 2004, plaintiff was seen by neurologist Dr. Leonard Langman every two weeks. [4] (Tr. 75, 102, 105, 107, 123-28, 192-487, 568-97, 657-66, 739.) From January 1997 through October 1998, he received physical therapy. (Tr. 488-516.) From June 2001 to July 2002, he was treated by orthopedic surgeon Dr. Gregory Perrier. (Tr. 75, 637-52, 739.) I will now summarize the findings of Mr. Riley's medical providers and of the medical consultants.

---

[3] Greater Metropolitan and Medical Specialist Consultants went into bankruptcy prior to plaintiff's hearing. The ALJ was able to obtain some of their records from the records submitted by Workers' Compensation. (Tr. 15, 694-95.)

[4] Despite a subpoena and the filing of a complaint with the New York State Department of Health, Office of Professional Medical Conduct, Dr. Langman did not provide the ALJ with a copy of plaintiff's medical file; instead, he produced only a few documents. (Tr. 15, 653-56, 694.)

A.  Treating Medical Providers

1.  New York Presbyterian Hospital

Plaintiff was initially treated for his injuries at the
emergency room at New York Presbyterian Hospital.  (Tr. 553-58.)
He had an abrasion on his forehead and his neck and shoulders
were tender.  (Tr. 555.)  A cervical spine x-ray was
unremarkable.  (Tr. 557.)  He returned to the hospital four days
later, complaining about memory loss and neck and head pain.
(Tr. 558.)  He was told to use Flexeril and Naprosyn for muscle
ache and pain, and to follow up with the hospital's Soft Tissue
Injury Clinic, if needed.  (*Id.*)

2.  Greater Metropolitan Medical Services
and Medical Specialist Consultants

On June 20, 1995, nine days after the accident, plaintiff
started receiving medical treatment from several physicians and
therapists at the Greater Metropolitan Medical Services and
Medical Specialist Consultants ("GMMS").  (Tr. 110-18, 140-91,
559-66, 610-14.)  June 23, 1995 x-rays of his lumbosacral spine
and cervical spine were normal, as were November 3, 1995 x-rays
of his cervical spine.  (Tr. 143, 154, 560-62.)

With a few exceptions, which I will discuss in more detail
below, the GMMS records consist of essentially the same
complaints and treatments on a computer-generated Worker's
Compensation Board form, with no clinical findings, and the
physicians' specialties are not noted on the form.  Records from
Drs. Sue Ellen Levy, Irving Friedman, Leonard Schuchman, Grace
Grochowski, Prasad Chalasani, and Mark Greenbaum found plaintiff
to be totally disabled for the period from June 1995 through May
1996.  They diagnosed him with "3482 benign intracranial hyper,
3102 postconcussion syndrome, 7840 headache, and 7238 other
syndromes affecting."  The records state that x-rays were taken
(on June 23, 1995 and on November 3, 1995), and that plaintiff
complained of back and neck pain, which were treated with
physiotherapy, hot packs, electrical stimulation, and ultrasound.
The records also say that plaintiff was experiencing frequent
headaches and dizziness.  (Tr. 110-18, 144-53, 158-67.)

On October 26, 1995, Dr. Friedman, a neurologist, reported
that a Somato-Sensory Evoked Potential (SSEP) test produced an
"abnormal study"; he wrote:

The above data is evidence for a conduction delay
along the Right cervical

-7-

```
        a)  Peripheral Nerve
        b)  Brachial Plexus
        c)  Spinal Root
```

(Tr. 563.)

On February 28, 1996, Dr. Schuchman, a board-certified practitioner of Family Medicine, completed a more detailed report than had been previously submitted by GMMS.  He wrote:

<u>PRESENTING COMPLAINTS</u>: The patient complains of constant throbbing occipital headaches accompanied by dizziness, memory loss and problem with swallowing.  He reports pain of the neck radiating to the right shoulder.  There is pain of the lower back.  Since the accident the patient has experienced insomnia, mood changes, scary flashbacks, difficulty remembering things and is frightened.

                    *      *      *

<u>EXAMINATION</u>:

<u>GENERAL</u>: ... He is wearing a cervical collar.

<u>MENTAL STATUS</u>: ... He has poor memory and processing is slow....

<u>GAIT</u>: The gait and associated movements restricted due to pain of the lumbar spine.

<u>RANGE OF MOTION</u>: There is restriction of flexion, extension and lateral rotation of the head on the neck.  There is limitation of forward flexion and lateral bending at the waist.  There is restriction of motion on abduction, flexion and rotation of the right shoulder.

<u>POWER</u>: Power is adequate throughout.  Muscle appearance is normal.

                    *      *      *

<u>MECHANICAL</u>: There is tenderness to percussion of the cervical and lumbar spine as well as paracervical and paralumbar muscle spasms. There is tenderness of the right shoulder.

> Codman's Jog and Wince test is positive on
> the right.  Spurling sign is positive
> bilaterally.[5]

> \*      \*      \*

> The remainder of the examination is essentially within
> normal limits.

(Tr. 140-42.)  Dr. Schuchman diagnosed post traumatic
encephalopathy, post concussion syndrome, post traumatic stress
disorder, post traumatic headaches, cervical and lumbar
myofascitis, and possible cervical radiculopathy. [6]  He
prescribed physical therapy, ordered an EEG, x-rays of the neck
and lumbar spine, and MRIs of the brain and cervical and lumbar
spine.  He also referred plaintiff to a neurologist and a
clinical psychologist.  (Tr. 141-42.)

On April 18, 1996, Dr. Levy noted that plaintiff was
experiencing pain in the lower back, and she diagnosed only
lumbar radiculopathy; she did not mention his previously
diagnosed neck condition.  (Tr. 168.)  On May 20, she added to
the diagnosis that plaintiff also complained of headaches, but
she did not mention the headaches in her June 18 notes.  (Tr.
169.)  She ordered an MRI of his lumbar spine, which was normal.
(Tr. 171.)

On July 29, 1996, plaintiff was seen by clinical
psychologist Jan Burte at Dr. Levy's request.  (Tr. 173-79.)
Dr. Burte's diagnostic impression of plaintiff was as follows:

> Insight into his own psychological functioning and
> adjustment appears to be good.  Judgment with regard to
> decisions affecting his own well-being is good.  There
> are no indications that Mr. Riley is not competent to
> manage his own affairs.

---

[5]  "A positive **Spurling's test** indicates nerve root
compression."  *Whitehurst v. Commissioner of Social Security*,
2008 WL 724164, at \*4, n. 4 (S.D.N.Y. Mar. 17, 2008), *citing
Taber's Cyclopedic Med. Dictionary* (20th ed. 2005), http://
www.statref.com (with my emphasis in bold font).

[6]  **Encephalopathy** is "any degenerative disease of the
brain."  Dorland's, p. 550.  **Myofascitis** is the "inflamation of a
muscle and its fascia, particularly of the fascial insertion of
muscle to bone."  *Id*. at 1090.

As Mr. Riley is not currently endorsing clinically
significant levels of emotional distress subsequent to
injuries stained on 6-11-95, further evaluation or
treatment is not considered to be necessary.

(Tr. 179.)

In late July and August 1996, Dr. Chalsani and Dr. Greenbaum
diagnosed lumbar radiculopathy, cervical myofascitis, and
headache.  (Tr. 172, 180.)  On October 4, 1996, Dr. Levy's
diagnosis was for only "backache, unspecified" (Tr. 182); yet she
had apparently ordered an MRI of plaintiff's brain for headaches
and dizziness.  The October 9, 1996 MRI showed "Right-sided
maxillary sinus mucoperiosteal thickening, ethmoid sinus
inflammatory change, and dolichocephaly." [7] (Tr. 181, 183 and
566.)  On November 12, 1996, Dr. Levy diagnosed neck sprain,
backache, post-concussion syndrome, and cervical myofascitis
but, three weeks later, she diagnosed only lumbago/myofascitis. [8]
(Tr. 185-86.)

Most of GMMS's records from January 1997 through 2000 are
missing.  However, the few Worker's Compensation Board forms we
do have show that: (1) Dr. Levy diagnosed plaintiff with lumbar
myofascitis in March 1998; (2) Dr. Friedman diagnosed plaintiff
with headaches and lumbar myofascitis in November 1999; (3) Dr.
Friedman diagnosed plaintiff with lumbar radiculopathy in January
2000 and in September 2000.  (Tr. 187-191.)

In addition, we have some progress reports made by Dr.
Friedman.  (Tr. 610-14.)  Dr. Friedman's November 1999 notes
indicate that plaintiff had restricted ranges of motion on squat
and forward flexion, and depressed deep tendon reflexes.  He
diagnosed chronic lumbosacral myofascitis, headaches and memory
disturbance.  (Tr. 610.)  Dr. Friedman's December 1999 notes
state that plaintiff presented with a "bizarre affect," and that
plaintiff complained of daily neck and back pain, as well as
nightmares and flashbacks.  The notes also say that plaintiff was
not taking any medications.  Dr. Friedman diagnosed chronic pain
syndrome, headaches, and chronic lumbosacral myofascitis.  (Tr.
611.)  In his 2000 notes, Dr. Friedman diagnosed lumbosacral
radiculopathy, bizarre affect, and depression.  He found
plaintiff's degree of disability to be "Permanent Total, 100%
severe disability."  (Tr. 612-614.)

---

[7]  **Dolichocephaly** means long-headed.  Dorland's, p. 504.

[8]  **Lumbago** is low back pain.  Dorland's, p. 956.

### 3. Dr. Gregory Perrier

Dr. Perrier, an orthopedic surgeon, first examined plaintiff on June 7, 2001. (Tr. 638-40.) He found that plaintiff's cervical and lumbosacral spine tested positive for muscle spasm, tenderness, myalgia, [9] radiculopathy, and decreased range of motion due to pain and stiffness. (Tr. 640.) Plaintiff did not take any medications for these conditions. (*Id.*) On August 7, 2001, plaintiff reported intermittent moderate cervical pain and constant moderate lumbar stiffness. (Tr. 641.)

On October 10, 2001, Dr. Perrier found that a "lumbar spine examination revealed positive paraspinal muscle spasm and a decreased range of motion secondary to pain and stiffness." (Tr. 642.) He diagnosed lumbar spine strain with radiculopathy and bulging disc. (Tr. 643.) He referred plaintiff for physical therapy and for MRI scanning of the lumbar spine, and he instructed plaintiff "about limitations of certain activities but advised [him] to stay as active as possible." (*Id.*)

From October 24, 2001 through July 24, 2002, Dr. Perrier reported decreased range of motion of the cervical spine and lumbar spine, and paraspinal spasm. (Tr. 644-652.) He diagnosed cervical and lumbar spine sprain/strain with radiculopathy, myalgia, neurapraxia and bulging/herniated disc. [10] (Tr. 644-652.) He treated plaintiff with physical therapy, anti-inflammatory medication, and Flexeril antispasmodic medication. (Tr. 644, 646-652.)

### 4. Dr. Leonard Langman

Dr. Langman, a neurologist, treated plaintiff approximately every two weeks for more than seven years, from January 22, 1997 through October 2004. (Tr. 75, 102, 105, 107, 123-28, 192-487, 568-97, 657-66, 739). Despite the ALJ's subpoena, phone calls, and a formal complaint he filed against Dr. Langman with the Board of Professional Responsibility, Dr. Langman refused to provide the ALJ with a copy of plaintiff's entire medical record. (Tr. 653-56, 694-95.) Accordingly, most of the records regarding

---

[9] **Myalgia** is a pain in a muscle or muscles. Dorland's, p. 1083.

[10] **Neurapraxia** is the "failure of conduction in a nerve in the absence of structural changes, due to blunt injury, compression or ischemia; return of function normally ensues." Dorland's, p. 1126.

Dr. Langman's treatment of plaintiff were provided by the Workers' Compensation Board, although plaintiff's counsel handed the ALJ a few additional documents at the hearing (see Tr. 657-66).

With a few exceptions, which I will discuss below, Dr. Langman's records mainly consist of identical forms he filled out for Workers' Compensation with accompanying letters that contain numerous typographical errors (including his name). [11] For the most part, the forms say that plaintiff received "neurological" or "neuro" treatment, and that he was totally disabled from regular work duties and could not do any type of work. When asked if the injury would result in a permanent restriction, total or partial loss of function of a part or member, or permanent facial, head or neck disfigurement, Dr. Langman wrote "undetermined" or "indefinite." The letters also say that plaintiff complained of neck and low back pain, and had "spasm in the neck and lower back." (Tr. 194-487, 568-97, 658, 660.) Many of the forms and letters were unsigned by Dr. Langman and/or contained different versions of his "signature." (Apparently, he allowed the different staff members who prepared the Workers' Compensation forms to sign his name, despite the fact that he was supposed to sign the forms himself, under penalty of perjury.) (Tr. 75, 102, 105, 107, 123-28, 192-487, 568-97, 657-66, 739).

On January 22, 1997, Dr. Langman examined plaintiff and found (a) spasms in cervical and lumbar spine, (b) diminished reflexes in right knee, (c) weakness of dorsiflexion of right great toe, (d) sensation was "natural," (e) Romberg was negative, and (f) Babinski was negative. [12] His initial diagnosis was cervical and lumbar radiculopathy, and he found plaintiff to be totally disabled. (Tr. 192-93.)

_____

[11] For instance, Dr. Langman's March 8 and 22, 1999 letters say:

SAir:

He comalins of neckandlower ack apin. Neo exam isu nchagned. He is totallyldiasbled a sa result athtis time.

(Tr. 266, 268.)

[12] **Romberg's** sign is the swaying of the body or falling when standing with the feet close together and the eyes closed. Dorland's, p. 1525. **Babinski's** sign is the loss or lessening of the Achilles tendon reflex in sciatica. *Id.* at 1520.

-12-

On March 24, 1997, Dr. Langman performed electromyography and nerve conduction ("EMG/NCV") studies. He diagnosed radiculopathy at C4-5. (Tr. 657.)

On August 7, 2002, Dr. Langman completed a disability report. (Tr. 123-28.) Plaintiff's symptoms were neck and low back pain. (Tr. 123.) In the section for clinical findings, Dr. Langman repeated the findings and diagnosis from his January 22, 1997 examination of plaintiff. (Compare Tr. 124 with Tr. 192.) He diagnosed cervical and lumbar radiculopathy and said that those impairments significantly limited plaintiff's ability to do basic work activities. (Tr. 124.) Dr. Langman said that plaintiff was receiving "neurological treatment," and that he was not taking any medications. (Tr. 125.) He also reported that plaintiff has to "lie down for about 1 hour [due] to the fact of all the pain he gets," and that "any kind of condition cause[s] patient pain." (Tr. 125.) Dr. Langman opined that, during an 8-hour workday, plaintiff's ability to do work-related functions were as follows: (1) he could occasionally sit; (2) he could stand "1% to 33% continuously"; (3) he could walk "1% to 33% continuously"; (4) he could occasionally lift and carry up to five pounds; (5) he could occasionally reach; (6) he could occasionally perform repetitive actions, such as simple grasping and fine manipulation with his hands; (7) he could occasionally use his feet for repetitive movements; (8) he had no restrictions regarding unprotected heights, being around moving machinery, exposure to marked changes in temperature and humidity, driving a vehicle, and exposure to dusts, fumes, gases, and noxious odors; and (9) he could travel alone by bus and subway. (Tr. 126-28.)

Less than six months later, on January 31, 2003, Dr. Langman completed a second disability report. (Tr. 661-66.) Dr. Langman reported that plaintiff complained of neck pain, lower back pain that radiated to his lower extremities, and spasms in his cervical and lumbar areas, which significantly limited his ability to do basic work activities. He again diagnosed cervical and lumbar radiculopathy, but he now added that an "examination of cranial nerves reveal spasm" in the cervical spine and the lumbar spine, and that "reflexes are diminished at the right knee." (Tr. 661-62.) He again said that plaintiff was receiving neurological treatment, but he now added that plaintiff was receiving medication (Bextra, which had no side effects). (Tr. 663.) Dr. Langman also said that plaintiff needs to lie down for at least 1-2 hours during the day. (Tr. 663.) Asked again to assess plaintiff's ability to do work-related functions in an 8-hour workday, Dr, Langman's second report listed more disabilities than his first report. He now opined that plaintiff: (1) could sit 1-2 hours continuously for a total of 2

hours; (2) could stand for 30 minutes continuously for a total of 30 minutes; (3) could walk 10 to 20 minutes continuously for a total of 20 minutes; (4) could occasionally lift and carry up to ten pounds; (5) could never reach, bend, squat, crawl, or climb; (6) could never perform repetitive actions with his hands; (7) could never perform repetitive actions with his feet; (8) had total restrictions regarding unprotected heights, being around moving machinery, exposure to marked changes in temperature and humidity, and exposure to dusts, fumes, gases, and noxious odors, and had mild restrictions regarding driving a motor vehicle; and (9) could travel alone by bus and subway. (Tr. 664-666.)

In an April 20, 2004 letter to plaintiff's workers' compensation attorneys, Dr. Langman essentially repeated his findings from January and March 1997. (Tr. 659.)

B.    Workers' Compensation Medical Examinations

1.    Dr. Howard Finkelstein

Dr. Howard Finkelstein, an orthopedic surgeon, examined plaintiff in June 1996, and again in March 1998. (Tr. 517-20.)

On June 19, 1996, plaintiff took public transportation to the doctor's office. Plaintiff complained of intermittent, localized low back and neck pain, as well as headaches and dizziness, which he got every two weeks. Dr. Finkelstein observed that plaintiff had a normal gait and posture, and that he could change positions in a normal fashion. (Tr. 518.) Plaintiff told Dr. Finkelstein that he could walk up to one mile and "stand for sufficient periods to accomplish whatever he had intended to perform," with localized distress. His low back condition did not result in pain radiating to his extremities, and it did not affect his motor strength or sensation of his lower extremities. (Tr. 518.) "Upon a clinical and objective orthopedic basis," Dr. Finkelstein opined that (a) "there has been resolution of the effects of the [June 11, 1995] trauma," (b) maximum medical improvement from treatment had occurred and no further treatment was warranted, and (c) plaintiff could return to any work of his choosing. (Tr. 520.)

On March 6, 1998, plaintiff again arrived at the doctor's office by public transportation. During the examination, plaintiff reported that he was "able to carry out the activities of daily living." (Tr. 524.) According to Dr. Finkelstein's report, plaintiff "dramatiz[ed] his complaints" by squinting his eyes, narrowing his forehead, contorting his face, and moaning. (Tr. 524-25.) Moreover, he declined to perform heel and toe

-14-

standing or squat, and he limited his range of motion in the upper and lower extremities, conducting his motions in a "limited" and "guarded" fashion. Dr. Finkelstein's examination results were normal except for muscle strength in the lower extremities; he rated that strength as 4 out of a normal 5. Dr. Finkelstein concluded that plaintiff had markedly overstated and dramatized his complaints. He found no orthopedic pathology, and determined that plaintiff did not require any further orthopedic treatment. Dr. Finkelstein concluded that plaintiff could return to his usual work with no restrictions. (Tr. 524-26, 546.)

On June 11, 1998, Dr. Finkelstein testified at plaintiff's Workers' Compensation hearing. (Tr. 527-41.) He said that plaintiff's June 18, 1996 MRI of the lumbar spine was normal, and that his findings on examination did not confirm Dr. Langman's March 24, 1997 EMG study findings of a C4-5 radiculopathy. (Tr. 530-31.) Plaintiff's range of motion in the cervical area and the lumbar spine were within the normal range, and there was no evidence of spasm in the cervical spine during the first examination. (Tr. 532, 536-37.) Dr. Finkelstein testified that, in his opinion, plaintiff was not disabled and, on an orthopedic basis, plaintiff could return to work. (Tr. 532-33.)

## 2. Dr. Allamprabhu Patil

Dr. Allamprabhu Patil, a board-certified neurologist, also examined plaintiff twice, in August 1996 and in March 1998. (Tr. 521-53.)

On August 3, 1996, plaintiff complained of back pain and difficulty walking and bending. (Tr. 521.) On examination, Dr. Patil observed that (a) gait was normal, (b) cervical spine showed full range of motion with no spinal tenderness, and (c) there was no tenderness in the lumbar spine. Dr. Patil's diagnosis was resolved lumbar sprain and resolved post-concussion syndrome. He reported that plaintiff was neurologically fit to work and did not need any further therapy or testing. Moreover, he found that plaintiff had "no objective evidence of disability from a neurological standpoint." (Tr. 522.)

On March 9, 1998, Dr. Patil examined plaintiff a second time. (Tr. 547-49.) Plaintiff complained of headaches, pain in his neck, back and left shoulder, and difficulty with walking, bending, sleeping and lifting. He was receiving physical therapy for these conditions three times a week, but did not take any medications. (Tr. 547.) Dr. Patil found normal motor power, reflexes, and sensation, but this time he observed marked spasm in the cervical and lumbar paraspinals. (Tr. 548.) Dr. Patil

opined that plaintiff had a marked partial disability from a neurological standpoint and that he was unable to return to work at this point.  He anticipated that if plaintiff followed up with a neurologist for three more months, then he would reach maximum medical improvement.  (Tr. 549.)

C.    The Social Security Administration's Consultants

1.    Dr. Mario Mancheno

On July 16, 1998, plaintiff was examined by Dr. Mario Mancheno, a consulting physician.  (Tr. 598-600.)  Plaintiff complained of constant back pain, which radiated to his buttocks, thighs and legs, and made it difficult for him to climb steps, push, pull, lift, carry heavy objects, bend down frequently, sit for more than 50 minutes, stand for more than 35 minutes, or walk for more than 5 blocks.  (Tr. 598.)  Plaintiff reported that he stayed home most of the time but did his own shopping, cooking and cleaning [this last part may have been a miscommunication between plaintiff and Dr. Mancheno].  (Tr. 598.)  Dr. Mancheno observed that plaintiff had no difficulty (1) raising himself up from a chair, (2) dressing, (3) undressing, (4) getting onto the examining table, (5) lying down, and (6) toe-heel walking or tandem walking.  Plaintiff's gait was steady and his posture was good.  (Tr. 598.)  Plaintiff had full range of motion of his upper and lower extremities, and a physical examination and an x-ray of his lumbosacral spine were normal, except for some tenderness in his L3 to S1 and right paraspinal area.  (Tr. 599, 600.)  Dr. Mancheno's diagnosis was discogenic disorder of the lumbosacral spine, and that plaintiff's prognosis was fair.  Dr. Mancheno opined that plaintiff had a severe impairment in lifting and carrying, and moderate limitations in standing and walking, pushing and pulling, and sitting.  (Tr. 599.)

2.    Dr. J.B. Jasmin

Dr. J.B. Jasmin, a State agency physician, did not examine plaintiff.  On August 10, 1998, Dr. Jasmin reviewed the medical records and completed a Residual Physical Functional Capacity Assessment.  (Tr. 601-08.)  Dr. Jasmin found that, in an 8-hour work day, plaintiff could (1) lift ten pounds frequently and twenty pounds occasionally, (2) stand, walk or sit about 6 hours each in an 8-hour workday, (3)  push and pull, (4) occasionally climb, stoop, crouch and crawl, (5) frequently balance and kneel. (Tr. 603.)  Plaintiff had no manipulative, visual, communicative, or environmental limitations.  (Tr. 604-05.)

### 3. Dr. Howard Finger

On August 29, 2000, plaintiff was examined by Dr. Howard Finger, an internist. (Tr. 615-18.) Plaintiff complained of chronic lower back pain with spasms, neck pain with spasms, recurrent headaches, nightmares, and a fear of elevators. (Tr. 615.) Plaintiff reported that his stepmother did most of the household chores while he spent much of his time sitting, resting, and watching television. He also reported that he traveled on his own by public transportation. (Tr. 615.)

Plaintiff was able, slowly, to get on and off the examining table and to dress himself without assistance. (Tr. 616.) He had full range of motion in the cervical spine and in most of his peripheral joints. There were no paravertebral spasms and there was normal side bending and extension of the lumbosacral spine. (Tr. 616.) A lumbosacral spine x-ray was negative; a cervical spine x-ray showed minimal degenerative spondylosis [13] at the C5-C6 level. (Tr. 618.) Plaintiff's gait was slow and stiff, although he could ambulate without a cane and each lower extremity exhibited muscle strength that Dr. Finger rated as "4+/5." (Tr. 616.) Dr. Finger's impressions were (a) chronic lower back derangement, (b) chronic derangement involving the cervical spine, (3) possible post-traumatic stress disorder, and (4) chronic recurrent headaches. Regarding work-related activities, Dr. Finger found that plaintiff appeared mildly limited in the duration of time he was able to sit, stand, and walk, and that he was moderately limited in his ability to lift and carry. Dr. Finger referred plaintiff to Dr. Algaze for a more detailed mental health evaluation. (Tr. 617.)

### 4. Dr. Joshua Algaze

On August 29, 2000, plaintiff was examined by Dr. Joshua Algaze, a psychiatrist. (Tr. 619-20.) Plaintiff complained of chronic lower back pain, chronic headaches, difficulty falling asleep, frequent nightmares, fear of elevators, and that he was easily startled. (Tr. 619.) Dr. Algaze noted mild speech deficits during the interview. Plaintiff reported that he lived with his mother and spent most of his day at home watching television and eating. (*Id.*) Plaintiff exhibited normal psychomotor activity, made good eye contact and was of low average intelligence. (Tr. 620.) Dr. Algaze diagnosed learning disability and personality disorder, not otherwise specified.

---

[13] Spondylosis is degenerative changes due to osteoarthritis. Dorland's at 1567.

He opined that plaintiff had moderate difficulties in personal, social, and occupational adjustment that impaired his ability to tolerate work pressures.  Dr. Algaze also believed that plaintiff would not be able to manage his own funds.  He recommended that plaintiff seek psychiatric help, as plaintiff's prognosis is guarded.  (*Id.*)

### 5.  <u>Dr. Jerome Kessel</u>

Dr. Jerome Kessel, a State agency physician, did not examine plaintiff.  On October 5, 2000, he reviewed the medical records and completed a Mental Residual Functional Capacity Assessment.  (Tr. 621-36.)  Dr. Kessel found that plaintiff had a personality disorder, not otherwise specified.  (Tr. 628.)  He reported that plaintiff (1) had mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace, and (2) was not significantly limited in understanding and memory, sustained concentration and persistence, social interaction, and adaptation.  (Tr. 631, 635-36.)  Dr. Kessel disagreed with Dr. Algaze's diagnosis of a learning disability.  (Tr. 633.)  He wrote that plaintiff did not give "definite evidence of a learning disorder" and could not be considered deficient.  He stated that plaintiff could travel alone and could use elevators if necessary, and that plaintiff did not show gross cognitive deficits or have significant restrictions in his mental functioning.  (*Id.*)  Dr. Kessel reported that plaintiff could (1) understand, remember, and carry out simple instructions, (2) concentrate for extended periods of time, (3) relate appropriately to coworkers and supervisors, and (4) adjust adequately to changes in the work environment.  (Tr. 633.)

### 6.  <u>Dr. Mohammad Khattak</u>

At page 4 of his brief, plaintiff's counsel informed me that Dr. Khattak had been removed from the panel of physicians who examine for Social Security.  I also note that the ALJ did not rely on his findings.  Accordingly, I will not consider Dr. Khattak's records.  (See Tr. 119-21.)

### 7.  <u>Dr. Rosenberg</u>

Dr. Rosenberg, a State agency physician, did not examine plaintiff.  On June 24, 2002, Dr. Rosenberg reviewed the medical records and filled out a Request for Medical Advice.  Noting that plaintiff had a normal gait, normal mobility, and normal x-rays of the cervical and lumbosacral spine, Dr. Rosenberg concluded that plaintiff could do medium work.  (Tr. 122.)

Our Court's review "is limited to inquiring into whether the [Commissioner's] conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Beauvoir v. Chater,* 104 F.3d 1432, 1433 (2d Cir. 1997), quoting *Cruz v. Sullivan,* 912 F.2d 8, 11 (2d Cir. 1990). Pursuant to 42 U.S.C. § 405(g), "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive..."

In evaluating a disability claim, the Social Security regulations require the Commissioner, through the ALJ, to apply a five-step process:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999), *quoting Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (my emphasis added).

At Step One, ALJ Levin determined that plaintiff had not engaged in substantial gainful activity since the date of his alleged onset of disability. (Tr. 22.) At Step Two, the ALJ

found that, in combination, plaintiff's cervical and lumbosacral sprains/strains, his stammer, his learning disability and his low normal intelligence were severe impairments. (Tr. 23.) At <u>Step Three</u>, the ALJ found that plaintiff did not have an impairment that was equal in severity to one listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P. (*Id.*) At <u>Step Four</u>, the ALJ found that plaintiff had the residual functional capacity to perform a significant range of light work that would allow him to (a) lift and carry 20 pounds occasionally and 10 pounds frequently, (b) stand and/or walk for at least 6 hours in an 8-hour work day, (c) sit for at least 6 hours in an 8-hour work day with the ability to stand and stretch every 30 to 45 minutes, (d) avoid climbing ropes, ladders or scaffolds, (e) kneel, crouch and crawl occasionally, and (f) avoid jobs requiring "totally clear verbal communication." (Tr. 23.) The ALJ also found that plaintiff could perform his past relevant work as a security guard. The ALJ also ruled that "in the event a reviewing body were to conclude –- as I do not –- that the claimant in fact has a 'severe' mental impairment," then Mr. Riley would not be able to perform his past work but, under <u>Step Five</u>, he could still perform a large number of available light jobs, such as (1) final assembler, (2) cafeteria attendant, (3) machine tender, (4) bench assembly worker, (5) button reclaimer, and (6) buckle wire assembler. (Tr. 23-24.)

Plaintiff's attorney argues that the ALJ's decision was not "supported by substantial evidence" or "reached by acceptable techniques or procedures." (Pl. Memo. p. 7.) Also at page 7, he makes four points:

Point 1. That despite the "pithy" nature of the reports by the treating physicians, their conclusions of disability are entitled to significant deference.

Point 2. That the ALJ failed to consider the combination of plaintiff's impairments.

Point 3. That the ALJ subjected the evidence to a standard that was "too rigorous" and unfair.

Point 4. That the ALJ substantially relied upon the estimates of non-examining physicians.

I will now discuss plaintiff's arguments in detail, although I will fold Point 4 into Point 1.

1.  <u>The treating physicians' conclusions of disability</u>

Plaintiff claims that the ALJ should have given plaintiff's medical providers' conclusions of disability "significant deference."  Specifically, he claims that the ALJ should have given "a fair amount of deference" to Dr. Langman's opinion of total disability because Dr. Langman is a specialist who treated him for an extended period of time.  (Pl. Memo. pp. 7, 9.)

As noted earlier, Dr. Langman and the GMMS providers did not supply any documents to the ALJ.  As a result, most of the comments of Dr. Langman and of GMMS available to the ALJ were the comments they had written on Workers' Compensation forms.  Most notably, at Question 8 on the "Workers Compensation Attending Doctor's Report and Carrier/ Employer Billing" forms, both Dr. Langman and the GMMS providers checked the following answers:

Is patient disabled from regular duties or work?
         Yes XX         No

If "yes" disability is:
         Total XX        Partial

(Tr. 110-18, 140-91, 559-66, 610-14 for GMMS's comments; Tr. 192-487, 568-97, 657-60 for Dr. Langman's comments.)

In my view, ALJ Levin made a reasonable decision when he rejected those disability findings by Dr. Langman and by GMMS.  *See Dibernardo v. Chater*, 979 F.Supp. 238, 243 (S.D.N.Y. 1997) (Sprizzo, J.) ("Nor did the ALJ have to give controlling weight to the fact that Dr. King marked a box for 'total disability' on two Workers' Compensation forms since Workers' Compensation requirements are different than the requirements regarding awards of disability benefits by the Commissioner.")  In a similar case involving an ALJ's rejection of a treating physician's disability findings that were written on Workers' Compensation forms, Judge Sharpe wrote:

> Moreover, the "ultimate finding of whether a claimant is disabled and cannot work is 'reserved to the Commissioner.'"  *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citation omitted).  "That means that the Social Security Administration considers the data that physicians provide but draws its own conclusions." *Id.*  Thus, a treating physician's disability assessment is not determinative.  *Id.*  Furthermore, where the evidence of record includes medical source opinions that are inconsistent with other evidence or are

internally inconsistent, the ALJ must weigh all of the
evidence and make a disability determination based on
the totality of that evidence. 20 C.F.R. §§
404.1527(c)(2), 416.927(c)(2).

Crowe appears to base part of her "treating
physician" argument on the Workers' Compensation (WC)
forms filed by Dr. Lowenstein, in which he indicated
(by way of checking a box) that she was "totally"
disabled. *See Pl.'s Br. at 3, 6;* (Tr. 189-90, 250-56).
This argument is unavailing for two reasons. First, as
already noted, the final determination of disability is
reserved for the Commissioner, and therefore the
doctor's opinions of "total" disability were not
binding on the ALJ. Second, the opinions were rendered
in the context of Crowe's WC claim, which is governed
by standards different from the disability standards
under the Social Security Act. See *Gray v. Chater*, 903
F.Supp. 293, 301 n. 8 (N.D.N.Y. 1995) ("Workers'
compensation determinators are directed to the worker's
prior employment and measure the ability to perform
that employment rather than using the definition of
disability in the Social Security Act." Therefore, the
ALJ was not required to find Crowe "totally" disabled
based on Dr. Lowenstein's WC notations alone.

*Crowe v. Commissioner of Social Security*, 2004 WL 1689758, at *3
(N.D.N.Y. July 20, 2004). *See also*, *Hopper v. Commissioner of
Social Security*, 2008 WL 724228, at *9 (N.D.N.Y. Mar. 17, 2008).

The ALJ was also justified in rejecting Dr. Langman's other
opinions. Generally, a treating source's opinion is given
controlling weight only if it is well-supported by medically
acceptable clinical and laboratory diagnostic techniques and is
not inconsistent with the other substantial evidence in the
record. 20 C.F.R. 404.1527(d)(2); *Snell v. Apfel*, 177 F.3d 128
(2d Cir. 1999). With respect to Dr. Langman's opinions, ALJ
Levin said:

I begin by saying that I find Dr. Langman's
opinions to be extremely lacking in credibility -- even
though he has been the claimant's treating physician
for by far the longest time and he does specialize in
neurology. He reports very little clinically abnormal
even on the one occasion when he bothers to record a
clinical examination (and I find that the report of
such in his April 2004 report is transparently a mere
copy of the original findings rather than a new

-22-

examination report).  The quality of his records is
appallingly poor -- not only in how little they say,
but for the first several years in the fact that he
does not even attempt to correct multiple gross
typographical errors.  He diagnoses lumbar
radiculopathy, but the only study done on that part of
claimant's body (the 1995 EMG/NCV) was entirely normal
-- as for that matter have both the plain films and the
MRI of claimant's lumbosacral spine been.  Contrary to
the entire record (including Dr. Langman's own file),
claimant has never even reported any symptoms
consistent with a lumbosacral radiculopathy (and I find
that Dr. Langman's statement of pain radiating to the
legs in the January 2003 report is a flat-out
invention). [14]

    Dr. Langman's other diagnosis is cervical
radiculopathy.  It is true that his own
electrodiagnostic study purports to find evidence of
such a condition.  However, the 1995 study found
nothing (closer in time to the accident).  In addition,
Dr. Cohen credibly testified that Dr. Langman's actual
study findings truly show only "minimal" deficits that
are, at best, equivocal.  I find it quite disingenuous
of Dr. Langman to make the diagnosis he does under the
circumstances.  In addition, as with the low back
condition, claimant makes absolutely no subject[ive]
complaints consistent with a lumbosacral radiculopathy
(at C4/5 on the right or any other level).  Indeed, Dr.
Langman does not state otherwise in either report or
anywhere on his records. [15]

_____

[14]  In this paragraph, the last sentence by the ALJ seems
incorrect to me.  In the January 2003 report, at Tr. 661, the
Social Security Administration's form asked Dr. Langman:  "2.
Describe in detail the patient's symptoms (the patient's
description of his or her impairments, including pain)."  Dr.
Langman then wrote what Mr. Reilly reported to him:  "Patient
complains of neck and lower back pain with radiating pain to the
lower extremities."  On the other hand, I agree with the ALJ that
the objective evidence does not support Mr. Riley's 2003
statement alleging pain radiating to the legs.

[15]  In this paragraph, the last two sentences by the ALJ
seem incorrect to me, for the same reasons I have stated in
footnote 14.

-23-

The ALJ then wrote: "I believe, from the present records, that the overwhelming conclusion from the majority of claimant's clinical and laboratory findings is that it is striking how little positive can be found on all those pages."  (Tr. 21.)

The ALJ's decision, at Tr. 17-20, made the following analyses of the opinions given by persons other than Dr. Langman:

(1) New York Hospital, which reported that plaintiff had a normal x-ray of his cervical spine immediately after the accident, diagnosed soft tissue injury, and reported normal neurological and memory testing (Tr. 17);

(2) Dr. Schuchman of GMMS, who found plaintiff to be only partially disabled, despite diagnoses of post-traumatic encephalopathy, post-concussion syndrome, post-traumatic stress disorder, post-traumatic headaches, cervical and lumbosacral myofascitis and possible cervical radiculopathy.  Moreover, the following were all normal:  June 20, 1995 x-rays of plaintiff's cervical and lumbosacral spine; October 26, 1995 cervical spine x-ray; November 30, 1995 EMG/NCV studies of the upper and lower extremities; October 9, 1996 MRI of the brain; and June 1996 MRI of the lumbosacral spine.  (Tr. 17.)

(3) Dr. Burte of GMMS, who conducted a psychological examination, and concluded that plaintiff had no psychological diagnosis and no disability in that sphere.  (Tr. 17.)

(4) Dr. Perrier, an orthopedist who diagnosed lumbosacral strain with radiculopathy, a disc bulge, and a cervical spine sprain/strain, and who advised plaintiff "to stay as active as possible."  (Tr. 18.)

(5) Dr. Finkelstein, an orthopedist who conducted two IME's for Workers' Compensation, and who believed plaintiff was not disabled but was instead "putting on a great show of dysfunction."  (Tr. 19.)

(6) Dr. Patil, a neurologist who conducted two IMEs for Workers' Compensation and whose first finding was similar to Dr. Finkelstein's finding, but whose second report found marked cervical and lumbar spasm, impaired tandem walking and inability to lie flat on the table.  Dr. Patil concluded that plaintiff had a marked partial disability and could not yet return to his previous job.  (Tr. 19.)

(7) Dr. Mancheno, an orthopedist consultant for the SSA, who

determined on July 16, 1998, that plaintiff had a discogenic disorder of the lumbosacral spine (despite a normal x-ray), and who thought plaintiff had moderate limits on sitting, standing, walking and pushing/pulling, and severe limits on lifting/carrying. (Tr. 19.)

(8) DDS review physicians [see Dr. Jasmin's records at Tr. 603-05] who concluded in August 1998 that plaintiff could perform light exertional activity, with occasional postural activities. (Tr. 19.)

(9) Dr. Finger, an SSA consultant, who "said that despite complaints of pain, [plaintiff] was not then taking any medications." He examined plaintiff and found that plaintiff's gait was slow and stiff, and that plaintiff had 4+/5 power in his lower extremities. An x-ray of plaintiff's lumbosacral spine was normal, and an x-ray of his cervical spine showed minimal degenerative disease. Functionally, Dr. Finger thought plaintiff had moderate limits on lifting/carrying and mild limits on sitting/standing/walking. (Tr. 19.)

(10) Dr. Algaze, who conducted a psychiatric consultation for the SSA. He diagnosed a learning disability and a personality disorder NOS, which he believed caused a moderate deficit in all mental functions. (Tr. 19.)

(11) DDS reviewers [see Dr. Kessel's records at Tr. 621-36] disagreed with Dr. Algaze and concluded that all of claimant's mental restrictions were mild. (Tr. 19.)

(12) Dr. Cohen, who testified that plaintiff's medically-determinable impairments were minimal osteoarthritis of the cervical spine and lumbosacral sprain/strain, and that "one would not expect that symptoms of a lumbosacral sprain/strain would go on for nearly as long as this claimant reports his to have done." He said that "virtually all" of the objective studies were negative, and that "virtually all" of the neurological examinations were normal. He also said that it was "'hard to put together' any of the claimant's subjective complaints with the clinical or radiographic findings (or lack thereof) that the records reflect." (Tr. 20.) Dr. Cohen opined that the most restrictive functional capacity that could reasonably be expected from plaintiff's proven medically-determinable impairments would be a nearly full range of light exertional activity. (Tr. 20.)

ALJ Levin wrote:

> I find that Dr. Cohen's conclusions give claimant

the maximum benefit of the doubt due on this record, so sparse is it in objective findings or anything correlating with Mr. Riley's picture of himself as so disabled or his subjective complaints.  To the extent that any other evaluators reached conclusions about his ability to function (besides Dr. Langman), Dr. Cohen's conclusions are in reasonable accord with them in a rough way (e.g. Dr. Finger, Dr. Mancheno, Dr. Patil, DDS review physicians in 1998), or are more generous to the claimant (e.g. [more generous than] Dr. Finkelstein).

(Tr. 21.)

At page 8 of plaintiff's memorandum of law, his attorney writes:  "The ALJ cites and relies extensively upon the estimates of non-examining physicians in violation of Second Circuit law." However, the Second Circuit law is that "nonexamining sources" may "override treating sources' opinions, provided they are supported by evidence in the record."  *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (citing 20 C.F.R. §§ 404.1572(f), 416.927(f)).

Moreover:  "Agency medical consultants are considered highly qualified physicians and experts in social security disability evaluations. ...  Thus, a treating physician's opinion may be trumped by the opinion of the state agency physician, a non-examining source, if such opinion is supported by evidence in the record."  *McConnell v. Astrue*, 2008 WL 833968, at *17 (N.D.N.Y. March 28, 2008) (McAvoy, J.).  *See also Punch v. Barnhart*, 2002 WL 1033543, at *12 (S.D.N.Y. May 21, 2002) (Gorenstein, M.J.).

Dr. Cohen's testimony gave a reasoned explanation for discounting Dr. Langman's opinions, and so did the ALJ. Moreover, the ALJ's decision carefully went through the evidence and explained how, on balance, it supported his conclusion that plaintiff was not disabled.

2.  <u>The ALJ considered the combination of plaintiff's</u> <u>physical and mental impairments on his ability to work</u>

Page 9 of plaintiff's memorandum argues:  "The ALJ further fails to appreciate the combined effects of all of plaintiff's impairments."  I interpret this as a claim that the ALJ gave insufficient attention to plaintiff's mental impairments.  On that topic, the ALJ noted that the evidence was conflicting.  He acknowledged the August 2000 report by psychiatrist Dr. Algaze, but he explained why he was more persuaded by the July 1996

report of Dr. Burte (a psychologist who examined and tested plaintiff, Tr. 173-79).  The ALJ wrote:

>      ... An MRI of the brain on October 9, 1996 was also normal except for sinusitis. ... Even a psychological examination for the clinic, done by Jan Burte, Ph.D., proved basically normal, and Dr. Burte concluded that claimant had no pyschological diagnosis and no disability in that sphere.

>                *     *     *

>      ... Mr. Riley had a psychiatric consultative evaluation [on August 29, 2000] by Joshua Algaze, M.D. ....  Dr. Algaze diagnosed a learning disability and a personality disorder NOS, causing (in his opinion) a "moderate" deficit in all mental functions. DDS reviewers disagreed, concluding that all of claimant's mental restrictions were "mild" (Ex. 15-F).

>      At this point, I state that I am unwilling to find, on this record, that Mr. Riley has any "severe" mental impairment - - at least not one that has lasted for the required durational period.  Of course he did suffer significant anxiety associated with his accident, at first.  However, his original treatment clinic had him evaluated by the psychological consultant (Dr. Burte), and that psychologist concluded that he had no diagnosable mental impairment and no mental limitations.  Furthermore, at no time since then has **any** of claimant's treatment sources felt that he needed any psychiatric treatment or even warranted psychotropic medication. ....  In addition, Mr. Riley never asserted any mental impairment at any time in his Workers Compensation case, nor for that matter did he do so in this Social Security case.  [Indeed, his attorney's thorough pre-hearing memorandum (Tr. 25-30) made no such claim, although at Tr. 29 it mentioned "marginal education level."] ....  I find that Dr. Algaze's conclusions (and the DDS findings based on them) constitute a mere voice crying in the wilderness on this record, and are not sufficient for me to conclude that claimant had or has any "severe" mental impairment.

(Tr. 17, 19-20, emphasis in the original.)

     At Tr. 23 at ¶ 3, the ALJ's decision was fairly generous

when it stated that the "combination [of plaintiff's] sprains/strains of the cervical and lumbosacral spines, a stammer, a learning disability and low normal intelligence" should be considered "severe."  At the next step, the ALJ concluded that those impairments did not prevent plaintiff from performing his past relevant work as a security guard.

The ALJ also wrote that "in the event a reviewing body were to conclude -- as I do not -- that the claimant in fact has a 'severe' mental impairment," then plaintiff would not be able to perform his previous types of work.  (Tr. 22.)  However, on the basis of the vocational expert's testimony, the ALJ determined that, in both the national and local economies, there was a significant number of light work jobs that plaintiff could perform even if his mental impairments were severe.  (Tr. 22-24.)

In short, the ALJ considered the combined effects of all of plaintiff's impairments.

### 3.  The ALJ applied the correct standards

At page 7, plaintiff's memorandum complains that the ALJ used standards and techniques that were "basically too rigorous and unfair."  I have already rejected this argument with respect to the treating and non-treating medical providers.  However, in this section, I will address the contention that the ALJ unfairly found that plaintiff feigned an expression of pain and was motivated by "secondary gain."  (Pl. Memo. pp. 7-8, discussing Tr. 16, 21.)

Under 42 U.S.C. § 423(d)(5):

> ... An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability ...; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph ... would lead to a conclusion that the individual is under a disability.

See also Gallagher v. Schweiker, 697 F.2d 82, 83-85 (2d Cir. 1983) and 20 C.F.R. § 404.1529(b).  In addition, the ALJ can use the claimant's credibility and motivation, as well as the medical

-28-

evidence of an impairment, to evaluate the true extent of the alleged pain and the degree in which it hampers his ability to engage in substantial gainful employment. *Hopper v. Commissioner of Social Security*, 2008 WL 724228, at *12 (N.D.N.Y. Mar. 17, 2008).

Page 9 of plaintiff's memorandum cites *Green-Younger v. Barnhart*, 335 F.3d 99 (2d Cir. 2003), "where the Court held that pain could be disabling in the absence of objective evidence." However, that case involved fibromyalgia, a very atypical condition which may properly be diagnosed even in the absence of objective findings. Mr. Riley's alleged back and neck impairments are the sort of impairments that can be determined objectively, and therefore *Green-Younger* is not on point.

In my view, the ALJ gave adequate weight to plaintiff's subjective complaints of pain, and balanced them against the objective evidence in the record. The ALJ noted that plaintiff "walked into the hearing with a normal gait, and exited the same way," despite testifying that he (a) could only walk "about a block before having to rest because of pain," and (b) could not lift or carry anything heavier than a television remote control. (Tr. 16.) The ALJ also noted that plaintiff said "oh!" when he first sat down and again when he rose to take the oath. The ALJ wrote: "Both of those occasions seemed unconvincingly unnatural to me -- not looking as though the claimant was really in pain, but much more like he was trying to impress me with his being so." (*Id.*) The ALJ noted that plaintiff "sat through the somewhat extended hearing without showing (other than as just noted) any signs of pain or discomfort whatsoever." (*Id.*) Five pages later, the ALJ wrote:

> ... [T]he claimant's demeanor at the hearing (including the way he moved) did not confirm anything like the degree of dysfunction that he was reporting. Quite plainly, there are aspects of "secondary gain" from claimant's being cared for in all things by family members (first his parents, then his godmother). However, the fact that claimant gets such attention by assuming a disabled role does not mean that he should be found to have any medically-determinable impairment that could reasonably be expected to cause such a disability.

(Tr. 21.)

Based on the objective evidence, the ALJ reasonably concluded that plaintiff's conditions did not produce the

disabling symptoms and pain he had alleged. In reading the
record, I found a striking illustration that supports this
conclusion. At Tr. 731-32 of the 2004 hearing, plaintiff
testified that he was unable to travel by bus or subway ever
since the June 1995 accident. To the contrary, in reports in
2002 (Tr. 128) and 2003 (Tr. 666), plaintiff's own treating
physician Dr. Langman said that plaintiff could travel alone by
bus and subway. Morever, three other doctors wrote in separate
reports that plaintiff said he came to their offices via public
transportation. See Dr. Finkelstein's reports of plaintiff's
visits on June 19, 1996 and March 6, 1998 (Tr. 518, 524), Dr.
Finger's report of plaintiff's visit on August 29, 2000 (Tr.
615), and Dr. Algaze's report of plaintiff's visit on August 29,
2000 (Tr. 619).


## CONCLUSION AND RECOMMENDATION

For the reasons stated above, I recommend that Judge Rakoff
affirm the Commissioner's decision and dismiss the Complaint.
Such a decision would deny plaintiff's motion (Docket # 9) and
grant defendant's motion (Docket # 12).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the
Federal Rules of Civil Procedure, any party may object to this
recommendation within 10 business days after being served with a
copy (i.e. **no later than May 21, 2008**) by filing written
objections with the Clerk of the U.S. District Court and mailing
copies (a) to the opposing party, (b) to the Hon. Jed S. Rakoff,
U.S.D.J. at Room 1340, 500 Pearl Street, New York, NY 10007 and
(c) to me at Room 1360, 500 Pearl Street. Failure to file
objections within 10 business days will preclude appellate
review. *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary
of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989) (per
curiam); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), and 6(e).
Any request for an extension of time must be addressed to Judge
Rakoff.

_Douglas F. Eaton (signature)_
DOUGLAS F. EATON
United States Magistrate Judge
500 Pearl Street, Room 1360
New York, New York 10007

Dated:    New York, New York
          May 2, 2008

Copies of this Report and Recommendation are being sent by mail to:

Douglas C. J. Brigandi, Esq.
214-11 Northern Boulevard, Suite 201
Bayside, NY 11361

John E. Gura, Jr.,
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, NY 10007

Hon. Jed S. Rakoff